**George B. PONZONI, Plaintiff,**

v.

**KRAFT GENERAL FOODS, INC., Defendant.**

**Civ. A. No. 90–3890.**

United States District Court, D. New Jersey.

Sept. 19, 1991.

Clifford A. Herrington, Margulies, Wind, Herrington & Katz, Jersey City, N.J., for plaintiff.

Christopher H. Mills and Alan G. Lesnewich, Collier, Jacob & Sweet, Somerset, N.J., for defendant.

## OPINION

LECHNER, District Judge.

This is an employment discrimination suit brought by plaintiff George B. Ponzoni ("Ponzoni") against defendant Kraft General Foods, Inc. ("Kraft"). Jurisdiction is alleged pursuant to the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 626, *et seq.* ("ADEA"), and 28 U.S.C. § 1331 and 1337.

Kraft now moves for summary judgment pursuant to Fed.R.Civ.P. 56 on the grounds that Ponzoni signed a valid and enforceable release and subsequently ratified the release by his conduct.[1] For the reasons set out below, summary judgment is granted.

*Facts*

Ponzoni was hired in December, 1954 by Maxwell House Coffee Company ("Maxwell House"), which is now a wholly-owned subsidiary of Kraft. Moving Brief, ¶ 1. During the term of his employment, Ponzoni served as a research scientist at various Maxwell House facilities involved in research and product development in the areas of food-product development, cryogenic technology, freeze drying and evaporation technology and logistics and technical applications. 1st Ponzoni Dep. 78:20–22; 2nd Ponzoni Dep. 19:5–10. As a result of Ponzoni's work, Kraft was awarded eleven patents. One patent application was pending at the time of his termination. 2nd Ponzoni Dep. 19:15–20:15.

On 31 March 1990, Ponzoni's employment at Kraft was terminated. At the

---

**1.** In support of its motion, Kraft submitted: Brief in Support of Defendant's Motion for Summary Judgment and for Other Relief (the "Moving Brief"); the Affidavit of Alan G. Lesnewich, Esq. (the "Lesnewich Aff."), and exhibits attached thereto; the Affidavit of John Ruff (the "Ruff Aff."); the Affidavit of Henry Helm (the "Helm Aff."); the Appendix in Support of Defendant's Motion for Summary Judgment and for Other Relief, Vol. I (the "App. Vol. I"), including the Transcript of Deposition of Ponzoni dated 11 January 1991 (the "1st Ponzoni Dep."), the Transcript of Deposition of Ponzoni dated 25 January 1991 (the "2nd Ponzoni Dep.") and the Transcript of Deposition of Ponzoni dated 20 March 1991 (the "3rd Ponzoni Dep."); the Appendix in Support of Defendant's Motion for Summary Judgment and for Other Relief, Vol. II (the "App. Vol. II"), including the Transcript

of Deposition of Margaret Hips, dated 28 February 1991 (the "Hips Dep."), the Transcript of Deposition of Daniel Zanetich dated 28 February 1991 (the "Zanetich Dep.") and the Transcript of Deposition of Kenneth I. Nowak, Esq. dated March 20, 1991 (the "Nowak Dep."); the Appendix in Support of Defendant's Motion for Summary Judgment and for Other Relief, Vol. III (the "App. Vol. III"); and the Reply Brief in Support of Defendant's Motion for Summary Judgment and for Other Relief (the "Reply Brief").

In opposition to this motion, Ponzoni submitted: the Brief in Opposition to Defendant's Motion for Summary Judgment and for Other Relief (the "Opposition Brief"); and the Affidavit of George B. Ponzoni in Opposition to Defendant's Motion for Summary Judgment (the "Ponzoni Aff.").

time of Ponzoni's termination he was employed at the Maxwell House facility in Hoboken, New Jersey (the "Hoboken Facility"). Ponzoni Aff., ¶ 2. During the course of Ponzoni's employment with Kraft, he received a Bachelor's degree of science in chemistry, a Masters degree and Ph.D. in business administration. App. Vol. III, D–46–47, Lesnewich Aff., ¶ 9. In addition, Ponzoni is a member of professional organizations and the American Association of Retired Persons (the "AARP"). App. Vol. III, D–45; 1st Ponzoni Dep. 22:25–23:7.

Prior to June 1989, Ponzoni and other employees of Kraft became interested in issues regarding aging and the work force. In an attempt to learn about older employees' rights, Ponzoni contacted the AARP. The AARP referred Ponzoni to Kenneth I. Nowak, Esq. ("Nowak"), an attorney with a Newark, New Jersey law firm, because he is knowledgeable in the field of the rights of older employees. 1st Ponzoni Dep. 93–97.

Ponzoni first met with Nowak in June 1989. Ponzoni was a representative and Chairman of the Hoboken Facility's Committee of Aging. The purpose of the meeting was to discuss issues relating to an anticipated work force reduction at the Hoboken Facility. Id. 97:3–99:11. This meeting was primarily educational; Ponzoni was informed in general terms about rights under the ADEA and the New Jersey Law Against Discrimination (the "NJLAD"), N.J.S.A. 10:5–12 et seq.. Ponzoni also received from Nowak or from the AARP two pamphlets concerning legal rights as a senior citizen.[2]

*Kraft Work Reduction Program*

In late 1989, Kraft began to undergo a massive restructuring of its world-wide coffee research and development organizations. Ruff Aff., ¶ 3. As a result of the restructuring, Kraft formed two "centers of expertise" for all coffee research: the North American COE (the "NACOE") to be located in Tarrytown, New York and the European COE (the "ECOE") to be located in Banbury, England. Id. NACOE was designed to support the United States and Canadian coffee businesses as well as to conduct product research for all world-wide Kraft roast and ground coffee businesses. ECOE was designed to support the European market and take over research of soluble coffees. Id., ¶ 4.

NACOE was formed by consolidating two research groups based in Hoboken, New Jersey—The Maxwell House Coffee Technical Research group and the Kraft International research group. Id., ¶ 3. By consolidating these two groups, Kraft created greater efficiency by decreasing the number of employees performing the same managerial and administrative functions and by reducing the number of technical specialists and levels of technicians. Id., ¶ 5.

In late 1989, as a result of the restructuring plans, Kraft began plans to implement a work force reduction program (the "WRP"). Id., ¶ 6. Although Kraft lacked a standard plan regarding reductions in the work force, it was the practice of Kraft to adopt a program as each occasion required. Helm Aff., ¶ 10. Despite slight variations in the wording and terms, every WRP had a two-phase implementation of voluntary and involuntary terminations. In addition every WRP offered an enhanced severance pay package to those terminated employees who executed a release waiving the right to raise any claims against Kraft. The WRP offered to the Hoboken Facility employees in February 1990 was implemented under the foregoing two phases.

On 20 February 1990, then Director of Research of the Hoboken facility, John Ruff ("Ruff") distributed an all-employee bulletin (the "20 February Bulletin") informing employees of the Kraft reorganization, the reasons for the reduction in work force and an indication of the support

---

**2.** Ponzoni received a pamphlet published by the New Jersey State Bar Association entitled "Law Points—Answers to Law–Related Questions of Special Interest to Senior Citizens" and one published by the AARP entitled "The Age Discrimi-nation In Employment Act guarantees you certain rights/Here's How...." Ponzoni read the latter as evidenced by his underlining and marking with paper clips certain passages. 1st Ponzoni Dep. 20:6–24:15.

Kraft would offer. Ruff Aff., ¶ 7. The Bulletin stated, in pertinent part:

> The consolidation is part of a restructuring of our worldwide coffee research which we recommended following extensive study by a team of research managers from around the world.
>
> *   *   *   *   *·   *
>
> Most of the research jobs at Hoboken will be transferred to Tarrytown, with relocation assistance available to eligible employees. About 20 jobs will be discontinued. We will attempt to achieve the reduction with voluntary retirements. Anyone whose employment is terminated will be provided with a broad array of support including job-hunting assistance, various counseling programs and severance payments.

20 February Bulletin.

On that same date, Ruff and Dr. Paul Jackson, Group Director of the Kraft International research group, held a meeting with affected employees. (the "20 February Meeting") Ruff Aff., ¶ 8. During the 20 February Meeting, Ruff explained the reasons for the restructuring and the effect on the Hoboken facility employees. In addition, he explained the two-phase voluntary and possibly involuntary WRP. *Id.* He stated that employees at least fifty years old with a minimum of ten years of service (the "50/10 Employees") could voluntarily terminate their employment and be eligible for enhanced severance pay benefits. *Id.* Ruff stated the 50/10 Employees would receive a package setting forth the details of the WRP immediately after the meeting. *Id.*

Ruff instructed the affected employees that they must inform payroll of their decision to participate in the voluntary phase no later than 8 March 1990. *Id.* Lastly, Ruff stated Kraft would make its decisions to offer new employment positions and whether to invoke the involuntary phase during the week of 12 March 1990. *Id.* At the close of the meeting, Ruff distributed the packages along with individualized letters to the 50/10 Employees. *Id.,* ¶ 9.

It is uncontroverted that Ponzoni received and read the 20 February Bulletin, 1st Ponzoni Dep. 50:18–20, attended the 20 February Meeting and received the 20 February package.[3] The package Ponzoni received contained a cover letter from Henry Helm, Human Resources Director–Eastern Region, to George Ponzoni (the "20 February Letter"). Ponzoni contends he did not read the 20 February letter at the time of receipt it; he merely glanced at it. Ponzoni Aff., ¶ 4. The 20 February Letter invited the addressee to participate in the voluntary phase of the WRP. The 20 February Letter outlined the details of the WRP, including the types of enhanced severance benefits available, time restrictions and the requirement for employees to sign a release to be eligible for the enhanced severance pay program. 20 February Letter.[4]

In addition, the package contained information on insurance, tax matters, pension benefits, special separation pay and a "Release of Claims/Designation of Beneficiary" form (the "Release").[5] Helm Aff., ¶¶ 8–9; App.Vol. III, D–7A–7T. The Release provided that the signatory relin-

---

3. Ponzoni had in fact been aware of such programs prior to 20 February 1990 because in 1988 he had been offered an opportunity to participate in a similar WRP. 1st Ponzoni Dep. 52:23–53:9, 70:25–71:9.

4. The 20 February Letter provided, in pertinent part, as follows:

> Because you are 50 years of age and possess 10 or more years of service with General Foods, you are hereby eligible to participate voluntarily in the General Foods USA Workforce [sic] Reduction Program.
>
> *   *   *   *   *   *
>
> You will be asked to sign a general release of all claims against Kraft General Foods as a

condition for the receipt of the severance for lead time payments. The severance or lead time payments granted to you will become effective only upon delivery to the Corporation of the release of claims document. 20 February 1990 Letter, ¶¶ 1, 13.

5. The Release contained language on two subjects. First, it contained language releasing all employee claims against Kraft. Second, it contained language regarding the subject of a designation of a beneficiary to the severance pay. Release.

quished all rights to raise any claims or demands that he or she may have against Kraft for any known or unknown, past, present or future acts or inactions of Kraft. Release. Such claims explicitly included ADEA claims and civil rights claims on whatever statutory basis against Kraft.[6] Release.

Ponzoni stated that after attending the meeting and receiving the package he had no intention of participating in the voluntary phase of the WRP. Ponzoni Aff., ¶ 4. Because of lack of interest in the voluntary termination phase, Ponzoni contends he only "looked at but did not review carefully" the 20 February Letter or package or any previous enhanced severance program. *Id.;* 2nd Ponzoni Dep. 43:17–44:7.

On or about 8 March 1990, Ponzoni met with Nowak[7] allegedly to discuss possible employment discrimination claims (the "8 March Meeting"). Ponzoni Aff., ¶ 5. Nowak testified at his deposition that prior to the 8 March Meeting, Ponzoni telephoned him and "indicated that, in fact, some of the concerns that had been raised several months before were, in fact, occurring." Nowak Dep. 21:20–23. Kraft argues, therefore, based on the deposition of Nowak and timing of the meeting, that Ponzoni met to discuss the ramifications of the Kraft reorganization. Moving Brief, ¶¶ 10–12.

It is unclear whether releases were discussed at the 8 March Meeting. Although Ponzoni does not recall discussing or receiving advice on releases during his meeting with Nowak, Ponzoni Aff., ¶ 6, he does not deny this. Nowak acknowledged that he had seen the 20 February Letter during the 8 March Meeting. Nowak Dep. 27:15–17. With respect to the Release, Nowak testified that he did not recall seeing the blank Release during the 8 March Meeting. *Id.* 29:2–4. Nowak, however, stated:

Q. Do you recall discussing the particular topic which is signing of a general release of claims during that meeting with Mr. Ponzoni?

A. Yes.

Q. Did he ask you during that meeting questions about signing a general release?

A. Well, I don't know if he specifically asked me a question about signing a release; but I do believe that there was a discussion about various options that would be available, various different strategies.

And I believe that I indicated to him that he should not sign any papers if he wasn't sure of what he was going to do and what he wanted to do; and that he

---

6. The Release provided, in pertinent part, as follows:

> In consideration of my being granted severance payments or lead time under the General Foods USA Work Force Reduction Program, I do hereby, for myself, my heirs, executors, and administrators, remiss, release and forever discharge General Foods Corporation ... of and from all claims and demands of every name, type, act and nature arising or existing by reason of any known or unknown ... act or inaction whatsoever. This release includes, but is not limited to, any claims, complaints, actions, or suits which have or might have been asserted under Federal, State or Local statutes concerning civil rights; unlawful employment practices or wage and hour requirements; Title VII of the Civil Rights Act of 1964; Civil Rights Act of 1871 (Section 1981); Fair Labor Standards Act; the Equal Pay Act of 1963; the Age Discrimination in Employment Act of 1967; the Rehabilitation Act of 1973 (Section 503 and 504); Executive Order 11246, as amended, any and all claims which I now have or may ever have had

regarding my employment and separation from employment with General Foods Corporation.

> I acknowledge that I have had an opportunity to be represented by Counsel of my choice who has had an opportunity to review this release and warrant that I am executing this document of my own free will, knowingly and voluntarily without any promises or representations other than those contained herein.

> This release operates to settle all claims, except such claims and demands against General Foods Corporation which have arisen or may arise under the General Foods' benefit plans under which I have continuing rights. App.Vol. III, D–5.

7. It is unclear whether Ponzoni's appointment with Nowak was on the 7th or 8th of March. Ponzoni testified at his deposition that the meeting was on 8 March 1990. 2nd Ponzoni Dep. 78:24–79:2. Nowak's records are unclear as to whether Ponzoni met with him on the 7th or 8th. Nowak Dep. 9:14–11:7.

could tell them, if they handed him papers, that he wanted to speak to his attorney.

*Id.* 27:18–28:9.

Later, Nowak testified the question of signing a release was raised in the context of what Ponzoni's approach should be, if and when he is terminated. *Id.* 61:24–62:15. Nowak reiterated to Ponzoni not to sign anything, to discuss any papers with an attorney and to try to negotiate with Kraft. *Id.* 62:2–9.

On 9 March 1990 Ponzoni declined to participate in the voluntary WRP. 2nd Ponzoni Dep. 93:12–98:22, App.Vol. III, D–12. As mentioned, Ponzoni stated he did not have an interest in the program and he thought Kraft would get a sufficient number of volunteers to avoid invoking the involuntary phase. Ponzoni Aff., ¶ 7.

On 12 March 1990 Ponzoni's supervisor, Bill Craig ("Craig"), notified Ponzoni that his position was terminated and directed him to leave the premises that day.[8] Thereafter, Ponzoni was taken to see Daniel Zanetich, the personnel manager ("Zanetich"). The facts regarding the actual discussion in Zanetich's office are unclear.

Zanetich testified that he expressed his regrets to Ponzoni and reiterated the need to downsize the facility. Zanetich Dep. 18:14–22. He stated Ponzoni was in shock and just repeated: "I don't know what I am going to do." *Id.* 19:1–25. Zanetich testified that because of Ponzoni's emotional turmoil and injury to his ego, Zanetich suggested treating the termination as a voluntary rather than involuntary one. *Id.* 19:8–12. After receiving the necessary authorization from Craig, Zanetich informed Ponzoni that his termination would be considered a voluntary one.[9] *Id.* 19:12–20. Before the meeting concluded, Zanetich "reminded [Ponzoni] that as part of the program, so he fully understood, was that there was a release of claims that had to be signed and that without the signed release of claims that he would not be entitled to

any of the termination benefits." *Id.* 20:1–5. Zanetich said Ponzoni then left his office with the Release. Zanetich does not, however, recall if he later witnessed Ponzoni's signature of the Release. *Id.* 20:5–21:4.

Ponzoni's recollection of the meeting is less clear and varies at different points of his deposition testimony. He testified that after the apologies, Zanetich told him he had to sign some documents.

Q. Did he go over with you anything about how you get your severance pay?

A. Well, he said, you must sign this document, and then we had a—backdated it to March 9.

Q. Do I understand you to say he told you that you had to sign the document in order to get your money?

A. Something to that effect, yeah.

1st Ponzoni Dep. 81:6–14. However, at another point in his deposition, Ponzoni testified that Zanetich merely stated that he must sign the document. *Id.* 83:20–22. According to Ponzoni, Zanetich did not "exactly say that you must sign in order to get your money...." *Id.* 84:2–5.

Ponzoni claims that he was in a state of shock and "in a fog" and, therefore, just signed the documents. Ponzoni Aff., ¶ 7. Ponzoni stated he did not read the document before signing it but claims he was pressured into signing it. *Id.* ¶ 7. Ponzoni could not recall, however, whether Zanetich told him he should read the Release.

Q. Did you read any part of the document?

A. No.

Q. None of it?

A. No.

Q. Did Mr. Zanetich tell you that you should not read it, but you should sign it?

A. He indicated, you must sign this document. That was the general tone of the conversation.

1st Ponzoni Dep. 83:14–22.

After signing the Release, Ponzoni returned to his work department with a copy

---

**8.** Ponzoni was to remain on payroll through 31 March 1990.

**9.** Ponzoni also asked Zanetich if his termination date could be extended. Zanetich stated Ponzoni would have to discuss the matter with his supervisor directly. Zanetich Dep. 19:20–25.

of the signed Release. Ponzoni claims it was at that time when he first read the Release. Ponzoni testified to his reaction when he read the release:

> As I went over it I said, hey, this is pretty serious.... It was more than what I thought I was signing ... you know, but as the fog cleared and time went by I said hey,—somewhere it said I'm entitled to legal counsel. I thought I should get some of that and see what gives.

*Id.* 111:3–14. Ponzoni testified he understood the Release language "in consideration" to mean that if you sign the Release you get your money. *Id.* 124:9–16.

Ponzoni then returned to Personnel to retrieve the Release. Ponzoni asked for the release and said "all bets were off." *Id.* 101:11–12. Although Ponzoni did not use the word rescind, he was aware of its meaning at the time he retrieved the Release.

> Q. Did I understand you correctly that you thought by saying words to the effect all bets are off to someone in the office you thought you had rescinded your signature on the release?
>
> A. Well, yeah. At least certain parts of it, right.

*Id.* 110:3–8. Ponzoni contends he believed he had rescinded the first paragraph of the Release which contained the in consideration language. *Id.* 123:21–124:18.

Ponzoni also testified that by retrieving the Release he wanted to digest it and change the address to his Clifton, New Jersey address.[10] *Id.* 89:9–10, 80:12–13. Ponzoni stated he wanted the information to come to his New Jersey address because he was there four days out of the week, he had the room for the next year and possibly for tax purposes. *Id.* 103:4–15. Ponzoni claims at the time he changed the address he was uncertain whether we would return the Release to payroll. Ponzoni Aff., ¶ 9. He testified that he then put the Release into his personal WRP file. 2nd Ponzoni Dep. 125:9–14.

When Ponzoni returned to his office with the Release, he also started reading through the entire package and 20 February Bulletin. *Id.* 90:11–91:3. At that point, Ponzoni claims that he assumed he would still be entitled to enhanced severance pay even though he had rescinded the Release because of his many years of service and because "whether you were separated voluntary, involuntary, they said you were going to get severance pay anyway." 1st Ponzoni Dep. 128:3–6.

After Ponzoni had retrieved the Release, he received a memorandum and telephone call from Margaret Hips of Personnel ("Hips") requesting his "white forms." *Id.*, ¶ 10. Ponzoni testified that Hips did not tell him which forms he needed or that forms were needed in order to receive enhanced severance pay. Hips merely referred to the white forms. Ponzoni then took the folder containing the documents in his possession to Hips and said to her: "[T]ake whatever you need." 1st Ponzoni Dep. 108:2–6. Ponzoni also stated he was unaware the Release was in the folder or that Hips took the Release. Ponzoni Aff., ¶ 10

Ponzoni testified at deposition that he did not discuss with Hips the Release or his entitlement to enhanced severance pay. *Id.* 108:19–109:6. He stated, however: "I think I was thinking about getting checks to the bank because I would need money— if this gets backed up ... the wolves would be at the door." 2nd Ponzoni Dep. 153:8–14. Ponzoni asserted that he did not become aware that Kraft possessed the Release until he was so informed by Nowak. Ponzoni Aff., ¶¶ 10–11. It was at that point that he surmised Hips had taken it from his folder. *Id.*

On or around 7 May 1990 Ponzoni received a check in the amount of $135,000 for enhanced severance pay. *Id.*, ¶ 11. Ponzoni argues he believed he was entitled

---

**10.** Ponzoni rented a room in Clifton, New Jersey where he stayed during the week to be closer to work when he was employed.

to the enhanced severance pay [11] and endorsed the check and deposited the check into his account in Tarrytown, New York. 1st Ponzoni Dep. 34:17–24.

On 24 May 1990 Ponzoni met again with Nowak to discuss his termination and possible age discrimination claims. During that meeting, Ponzoni did not tell Nowak that he signed the Release or that he had retrieved the signed Release from Kraft. Nowak Dep. 39:5–19. Ponzoni claims he did not request Nowak to investigate his termination and inquire whether an extension of his employment was possible. Nowak testified Ponzoni did ask him to write to Kraft regarding his termination. Therefore, Nowak wrote Raymond Viault, the President of Maxwell House Coffee Company, to confirm the validity of the facts before pursuing Ponzoni's claims. *Id.* 38:20–41:14.

Kraft in-house counsel, Burton L. Reiter, wrote Nowak explaining the reasons for Ponzoni's termination and enclosed a copy of the Release. After learning of the Release Nowak decided not to represent Ponzoni in an action against Kraft. Nowak questioned Ponzoni about the Release and why he had not been informed of it earlier. According to Nowak, Ponzoni did not inform him of it because "he had doubts about the validity...." *Id.* 48:21–24. After receiving Nowak's decision not to represent him, Ponzoni had no further communications with Nowak.

On 29 June 1990 Ponzoni filed discrimination charges with the Equal Employment Opportunity Commission (the "EEOC") and the New Jersey Division on Civil Rights. During the proceeding Ponzoni made a

sworn statement to Investigator Pinion of the EEOC: "to my knowledge I was entitled to two (2) weeks of severance pay. I signed a release so that I should receive twenty-four (24) weeks of severance pay." [12] App.Vol. III, D–44 ¶ 9. During his deposition testimony, however, Ponzoni did not recall telling the agent that he signed the release in order to receive enhanced severance pay. 2nd Ponzoni Dep., 150:15–17.

On 28 September 1990, Ponzoni filed his Complaint and ceased his pursuit of his administrative actions. Ponzoni alleged Kraft discriminated against him in violation of the ADEA and NJLAD. On 6 December 1990 Ronald J. Hedges, United States Magistrate Judge, ordered limited discovery regarding the threshold issue of the validity of the Release pursuant to Kraft's request. Magistrate Judge Hedges directed that discovery be completed by 31 January 1991 and later modified the direction allowing the parties until 1 April 1991 to complete discovery.

*Discussion*

Kraft moves for summary judgment under Fed.R.Civ.P. 56 on the ground that Ponzoni has failed to introduce evidence which establishes the existence of a genuine issue of material fact. Kraft contends there is no genuine issue of material fact because Ponzoni voluntarily executed a valid Release which he never rescinded. Kraft also contends that if it is determined the Release executed by Ponzoni was invalidly executed or rescinded, Ponzoni nevertheless ratified the release by accepting the enhanced severance pay. Kraft contends

---

**11.** Throughout the course of discovery, Ponzoni maintained he believed he was entitled to the enhanced severance pay. His belief is based either on the fact that the 20 February Bulletin said "[a]nyone whose employment is terminated will be provided with ... severance payments," 1st Ponzoni Dep. 127:25–128:56, or because of his many years of service. 2nd Ponzoni Dep. 156:2–15.

**12.** The WRP in fact entitled Ponzoni to twenty-four months, not twenty-four weeks, enhanced severance pay.

Ponzoni's statement is an admission and outside the definition of hearsay. In addition,

sworn testimony obtained during an EEOC investigation is admissible as evidence in the trial court's discretion. *Walton v. Eaton Corp.*, 563 F.2d 66, 75 n. 12 (3d Cir.1977) (EEOC factual findings are inadmissible, however, portions of EEOC file may be admitted); *Mullen v. New Jersey Steel Corp.*, 733 F.Supp. 1534, 1542 n. 7 (D.N.J.1990) (affidavit submitted by plaintiff during EEOC investigation admissible); *but see Astoria Fed. Savings and Loan Ass'n v. Solimino*, ——— U.S. ———, 111 S.Ct. 2166, 2170–71, 115 L.Ed.2d 96 (1991) (factual findings of an administrative agency not given preclusive effect).

that if summary judgment is not granted, it is entitled to a separate trial on the sole issue of the validity of the Release.[13]

### A. Summary Judgment Standard of Review

To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The present task is to determine whether disputed issues of fact exist, but a district court may not resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *see Nathanson v. Medical College of Pennsylvania*, 926 F.2d 1368, 1380 (3d Cir.1991) (Summary judgment may not be granted "if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed."). All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Boyle v. Governor's Veterans Outreach & Assistance Center*, 925 F.2d 71, 75 (3d Cir.1991); *Weldon v. Kraft, Inc.*, 896 F.2d 793, 797 (3d Cir.1990); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Todaro v. Bowman*, 872 F.2d 43, 46 (3d Cir.1989); *Joseph v. Hess Oil*, 867 F.2d 179, 182 (3d Cir.1989). " 'Any "unexplained gaps" in material submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment.' " *Ingersoll–Rand Fin. Corp. v. Anderson*, 921 F.2d 497, 502 (3d Cir.1990) (quoting *O'Donnell v. United States*, 891 F.2d 1079, 1082 (3d Cir.1989)).

Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a genuine issue of material fact,

its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' ... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'

*Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1356 (emphasis in original, citations and footnotes omitted). In other words, the inquiry involves determining " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir. 1990) (quoting *Anderson v. Liberty Lobby*, 477 U.S. at 251–52, 106 S.Ct. at 2512), *cert. denied*, —— U.S. ——, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991).

The Supreme Court elaborated on the summary judgment standard in *Anderson v. Liberty Lobby:* "If the evidence [submitted by a party opposing summary judgment] is merely colorable ... or is not significantly probative ... summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). The Supreme Court went on to note in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323–24 (footnote omitted).

■ Once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of coming forward with *specific* facts evidencing a need for trial. *see* Fed. R.Civ.P. 56(e); *see also Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67, 72 (3d Cir. 1990) (non-moving party may not rest upon

---

**13.** Summary judgment is granted for the reasons set forth below. Accordingly, it is unnecessary to consider the issue of a separate trial

concerning the issue of the validity of the Release.

mere allegations); *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir. 1990) (neither unsupported allegations in pleadings and memoranda of law nor conclusory allegations in affidavits will establish genuine issue of material fact); *Hozier v. Midwest Fasteners, Inc.,* 908 F.2d 1155, 1165 (3d Cir.1990) (cannot create issue of fact merely by questioning credibility of movant's witnesses; circumstantial evidence may raise issue of fact); *Aronow Roofing Co. v. Gilbane Building Co.,* 902 F.2d 1127, 1128 (3d Cir.1990) ("summary judgment will be granted where the nonmoving party fails to 'establish the existence' of an element essential to the case"); *Carlson v. Arnot–Ogden Memorial Hosp.,* 918 F.2d 411, 413 (3d Cir.1990) ("nonmoving party must adduce more than a mere scintilla of evidence in its favor").

### B. Waiver Analysis

■ Kraft argues Ponzoni waived his right to raise ADEA claims by signing the Release. As the Third Circuit has stated: "It is well-established that a release is the giving up or the abandoning of a claim or right to the person against whom the claim exists or the right is to be enforced or exercised...." *In re Bankers Trust Co.,* 752 F.2d 874, 883 (3d Cir.1984). Kraft asserts that the Release executed by Ponzoni constitutes just such waiver. The language of the Release provided:

> In consideration of my being granted severance payments ... I do hereby ... release and forever discharge General Foods Corporation ... of and from all claims and demands of every name, type, act and nature arising or existing by reason of any known or unknown ... act or inaction whatsoever.

> *This Release includes,* but is not limited to, any *claims ... asserted under Federal, State or local statutes concerning civil rights; ... the Age Discrimination in Employment Act of 1967; ...* and all claims which I now have or may ever have regarding my

employment ... with General Foods Corporation.

App.Vol. III D–5 (emphasis added).

### 1. *Waiver of ADEA Claims*

■ To be valid, a waiver must be knowing and willful. *See Coventry v. U.S. Steel Corp.,* 856 F.2d 514, 518 (3d Cir.1988). "[S]ubject to a close evaluation of various factors that are indicia of 'knowing' and 'willful' waiver, employees may execute valid waivers of their ADEA claims." *Cirillo v. Arco Chem. Co.,* 862 F.2d 448, 451 (3d Cir.1988), *Coventry,* 856 F.2d at 518; 29 U.S.C. § 626(f). To determine whether an employee executed a release knowingly and willfully, the Third Circuit has adopted a "totality of circumstances" test. *Coventry,* 856 F.2d at 524. The factors to consider in the analysis include, but are not limited to:

> (1) the clarity and specificity of the release language; (2) the plaintiff's education and business experience; (3) the amount of time plaintiff had for deliberation about the release before signing it; (4) whether Plaintiff knew or should have known his rights upon execution of the release; (5) whether plaintiff was encouraged to seek, or in fact received benefit of counsel; (6) whether there was an opportunity for negotiation of the terms of the Agreement; and (7) whether the consideration given in exchange for the waiver and accepted by the employee exceeds the benefits to which the employee was already entitled by contract or law.

*Cirillo,* 862 F.2d at 451.[14] Analyzing the totality of the circumstances here, Ponzoni's signing of the Release effected a valid waiver of his ADEA claims.

### a. Clarity and Specificity of the Release Language

■ The Release language is clear and specific. The Release unequivocally states it applies to "all claims and demands of every name, type, act and nature arising or existing by reason of any known or un-

---

**14.** In adopting the totality of circumstances standard of review, the Third Circuit rejected the approach of other Courts of Appeals which applied ordinary contract principles to determine the enforceability of a waiver. *Cirillo,* 862 F.2d at 451.

known, past, present or future act or inaction whatsoever." Release, ¶ 1. The Release continues to describe with particularity the nature of claims it covers as:

> any claims ... which have or might have been asserted under Federal, State or Local statutes concerning civil rights; unlawful employment practices or wage and hour requirements; Title VII of the Civil Rights Act of 1964; Civil Rights Act of 1871 (Section 1981); Fair Labor Standards Act; the Equal Pay Act of 1963; the *Age Discrimination in Employment Act* of 1967; the Rehabilitation Act of 1973 (Section 503 and 504); Executive Order 11246, as amended, any and all claims which I now have or may ever have had regarding my employment and separation from employment with General Foods Corporation.

*Id.* (emphasis added).

When a release explicitly refers to ADEA claims, it has been found to be straightforward and certain. *See Pears v. Spang*, 718 F.Supp. 441, 445–46 (W.D.Pa. 1989). Ponzoni argues because the Release combines two subjects, the Release and a designation of beneficiary, it is inherently confusing. The fact that the Release included a designation of beneficiary request does not detract from the clarity of the Release. The designation of beneficiary request was the last and a separate paragraph of the Release.

b. Education and Experience of Plaintiff

The second factor, education and experience, *see Cirillo*, 862 F.2d at 451, is a minimal threshold. In *Pears*, the court found the plaintiff's high school diploma and attendance of a one-year secretarial school at Boston University to have constituted sufficient education and experience to execute a Release. *See* 718 F.Supp. at 446.

In this case, it is uncontroverted that Ponzoni is a very highly educated and experienced man. He received a Bachelor's degree in Science and Master's and Doctorate degrees in Business Administration. During his thirty-four years of employment at Kraft, Ponzoni's work resulted in twelve patents and he belongs to various professional organizations and associations. In addition, Ponzoni served as chairperson of an aging employee's group at Kraft.

c. Deliberation Time Prior to Signing

Kraft distributed the package containing the Release on 20 February 1990, the same day of the 20 February Bulletin and Meeting. During the 20 February Meeting, Ruff described the two-phase WRP and instructed the employees to inform payroll no later than 8 March 1990 of their decision to participate in the voluntary reduction phase. Ponzoni attended this meeting.

Similarly, the 20 February Letter contained in the package stated the employees must make a decision by 8 March 1990. Although Ponzoni claims he only glanced at this letter and contents of the package, he declined to participate in the voluntary reduction phase on 9 March 1990. Ponzoni therefore had over two weeks to deliberate about the Release before making his decision. By the time Ponzoni signed the Release on 12 March 1990,[15] his deliberation time increased to almost three weeks.

Ponzoni alleges that because he had no intention of participating in the voluntary phase until his involuntary termination on 12 March 1990, the deliberation time should run from that date. Accepting Ponzoni's contention as accurate, his decision not to read the Release was a deliberate decision on his own part. Ponzoni testified that Zanetich did not ask him to sign immediately, when Ponzoni was in Zanetich's office on 12 March 1990. 1st Ponzoni Dep. 82:13–15.[16] As well, Ponzoni had been advised by Nowak that he was entitled to counsel before he signed any document regarding termination from Kraft. Nowak Dep. 28:5–9. Ponzoni has not presented evidence from which an inference could be drawn that had Ponzoni requested addition-

---

**15.** Although the Release is dated 9 March 1990 both parties agree that it was actually signed on 12 March 1990 and back-dated to 9 March 1990.

**16.** In his deposition, Ponzoni testified:

Q. Did he say you have to sign it before you leave the office?

A. No, he didn't use those terms.

1st Ponzoni Dep. 82:13–15.

al time to deliberate signing the Release, Zanetich would have refused.

■ Ponzoni's conclusory allegations of being pressured into signing the Release on 12 March 1990 also fall short of generating a genuine issue of material fact. In *Coventry*, the plaintiff argued his waiver of claims was made under duress. The Third Circuit held that a plaintiff must establish "a wrongful act or threat which prevented a party from exercising his free will and judgment" to constitute a claim of duress. *Coventry*, 856 F.2d at 524 n. 12 (quoting *Plechner v. Widener College, Inc.*, 569 F.2d 1250 (3d Cir.1977)).

In *Coventry*, the court noted the choice presented to the employee was little more than a "Hobson's choice." 856 F.2d at 524. The court observed:

> Hallas testified that he was advised by Wilson that his only options were accepting the mutual option pension benefits, and foregoing his claims, or being placed on automatic lay-off and losing his income and hospitalization benefits immediately. Moreover, in light of USS's policy of denying severance benefits to persons who were 'otherwise eligible' for a pension plan, Hallas could not opt to have his employment terminated completely and take severance benefits. 'Hallas's choice,' therefore, after thirty-five years of service, was between a lay-off of uncertain duration, that would bring the certain cessation of his income, and an early retirement plan that would make pension benefits available to him only if he agreed to forego his rights under the ADEA. These circumstances illustrate that Hallas's decision to sign the release was not the result of negotiation between him and his employer and, further, that Hallas was placed in precisely the 'take it or leave it' predicament that supports a finding that his decision was not knowingly and willfully made. These circumstances should have been considered by the district court in its determination of the validity of Hallas's waiver.

856 F.2d at 524.

*Coventry* is easily distinguished from the facts surrounding Ponzoni. During Ponzo-

ni's meeting with Zanetich on 12 March 1990, Ponzoni attempted to negotiate his termination date, albeit unsuccessfully. Ponzoni was not confronted with a Hobson's choice. Regardless of whether Ponzoni signed the Release, he was still entitled to his pension benefits. If Ponzoni did not sign the Release, he would still enjoy normal severance pay. In fact, by signing the Release in exchange for enhanced severance pay, Ponzoni received an additional twenty-four months' pay—$135,000.

Ponzoni was not prevented from exercising his free will and judgment. As stated, Ponzoni could not recall the words said to him in Zanetich's office. He could not remember whether Zanetich told him to read the Release before signing it or exactly what Zanetich's words were with respect to Ponzoni's reading the Release before signing it. 1st Ponzoni Dep. 83:13–84:5. Ponzoni has not presented facts to prove or infer he was denied time to deliberate signing the Release or that Kraft pressured him to immediately sign the Release. Ponzoni's mere allegation that he was under pressure, absent a showing of a wrongful act or some support, is insufficient to establish a genuine issue of material fact regarding duress.

d. Plaintiff's Knowledge of His Rights

It is uncontroverted Ponzoni was aware of a possible age discrimination claim arising out of the WRP. Opposition Brief, 17. Not only had he discussed the matter with Nowak, he read pamphlets published by the AARP and New Jersey State Bar Association. *Id.*

Ponzoni's contention that he was unaware of age discrimination claims could be waived is without merit. Ponzoni testified he visited Nowak on 8 March 1990 to discuss the ramifications of the Kraft reorganization. Ponzoni had a full opportunity to read the Release prior to that meeting and to raise any questions regarding whether such claims could be waived.

Upon reading the express terms of the Release, Ponzoni would have and clearly

should have realized that by signing the document, he would forego his rights under the ADEA. Ponzoni contemplated the possibility of ADEA claims, met with Nowak to discuss older employees' rights and then signed an explicit release of these claims. Ponzoni, a highly educated individual, knew of his rights upon execution of the Release. He was quite involved with the issues concerning aging and the work force.

### e. Plaintiff's Opportunity to Seek Counsel

On 8 March 1990 Ponzoni sought legal advise from Nowak regarding his individual situation. Ponzoni denies but Nowak is uncertain whether the Release was specifically discussed. Ponzoni Aff. ¶ 6; Nowak Dep. 29:2–4. Nowak testified, however, he discussed the general topic of signing releases. *Id.* 27:18–25. Nowak informed Ponzoni of the various options under work reduction programs and not to sign the papers unless he was certain. Nowak also advised Ponzoni that he had a right to consult an attorney before he signed anything. *Id.* 27:25–28:9.

■ Regardless of whether the 8 March Meeting constituted consultation with counsel, Ponzoni cannot take advantage of this factor. Unlike the release in *Coventry*, the Release explicitly stated the signatory had the opportunity to consult with counsel. Even where a plaintiff does not seek counsel, an express statement regarding his or her right to do so satisfies this factor. *See Pears*, 718 F.Supp. at 446. The focus is whether consultation with a lawyer was encouraged orally or in writing, not whether a plaintiff in fact received the benefit of counsel. *See Cirillo.*, 862 F.2d at 454; *see also Mullen v. New Jersey Steel Corp.*, 733 F.Supp. 1534, 1545 (D.N.J.1990) (defendant did not actually discourage employee from seeking counsel).

17. In his deposition, Ponzoni testified:
Q. So you asked Bruckman if you could, in a sense, be extended on the payroll?
A. Yeah.
. . . . .
Q. How much time had you asked for?

The fact that the Release contained an express written statement that Ponzoni had the opportunity to see counsel alone is sufficient to satisfy this factor. Nevertheless, Ponzoni did have the benefit of advice from Nowak before he signed the Release.

### f. Plaintiff's Opportunity to Negotiate

In *Cirillo*, the Third Circuit explained:
[T]the existence of an opportunity to negotiate with respect to a release is a substantial indicia that its execution was knowing and voluntary. While the absence of such an opportunity is not as strong an indicia that a release is unknowing or involuntary, to the extent such absence and other evidence suggest that the atmosphere surrounding the execution was oppressive, it is, of course, a relevant consideration.

862 F.2d at 454 n. 4. Cirillo had no direct opportunity to negotiate the terms of the special allowance or the release. He did, however, after being terminated, request an extension of his length of service in order to increase his benefits package. The Circuit stated that Cirillo's efforts indicated he
did not perceive himself as being completely at the mercy of an intractable employer ... [and] perceived the channels for negotiation open and in fact availed himself of them in an effort to stay his date of termination.

*Id.* at 454 n. 4.

■ In this case, the facts are similar to *Cirillo*. Ponzoni admits he attempted to negotiate an extension of his employment with Kraft. Opposition Brief, 18. If Ponzoni received an extension of employment, he would increase his pension benefits.[17] Ponzoni's contention that his efforts to extend his employment are irrelevant to the issue of negotiating the terms of the Release are without merit.

As was the case in *Cirillo*, the fact that Ponzoni raised the issue of an extension of

A. I think I was asking for, like, 11 months.... That would give me another year. Five percent plus they average my five year salary.... So I would be getting a higher percentage of a higher base.
1st Ponzoni Dep. 121:8–122:9.

employment does not give rise to an oppressive atmosphere. Ponzoni's testimony regarding the execution of the Release does not establish or suggest oppressive circumstances precluding his ability to negotiate the terms of the Release. Ponzoni testified that Zanetich did not demand that he sign the Release before he left Zanetich's office. Ponzoni further testified that he signed the Release in Zanetich's office because he was "in a fog" and just did what was requested. 1st Ponzoni Dept. 82:13–21. Although Ponzoni did not seek out an opportunity to discuss or negotiate the release of specific claims before signing the Release, he has not established or suggested there was an oppressive atmosphere. The absence of Ponzoni's opportunity to specifically negotiate the language regarding ADEA claims is not a strong indicia that the waiver was unknowing or involuntary.

### g. Consideration

■ The last factor, whether the consideration given in exchange for the waiver and accepted by Ponzoni exceeds the benefits to which he was already entitled by contract or law, *Cirillo*, 862 F.2d at 451, supports finding a valid waiver. Kraft has no standard enhanced severance pay program for its employees whose employment is terminated. Helm Aff., ¶ 10. Rather, Kraft adopts a two-phase reduction program as each occasion requires. At the 20 February Meeting employees, including Ponzoni, were informed that 50/10 Employees who participated in the voluntary reduction phase would be eligible for an enhanced severance package of up to the equivalent of two years salary. Ruff. Aff.,

¶ 8. The 20 February Letter further described the available enhanced severance options. Although Ponzoni apparently had some severance pay available,[18] neither his contract nor prevailing law entitled him to the $135,000 he received.

As was the case in *Cirillo*, the Release made no attempt to interfere with or cut-off the pension benefits or unenhanced severance pay to which Ponzoni was entitled. The Release was an additional package offered to 50/10 Employees whereby they could exchange their right to bring employment claims against Kraft for an enhanced severance package. Ponzoni was not forced into signing the Release under the threat of losing benefits to which he was already entitled.

Ponzoni alleges the consideration does not exceed the amount he was already entitled to as an involuntarily terminated employee. The 20 February Bulletin states:

> We will attempt to achieve the reduction with voluntary retirements. Anyone whose employment is terminated will be provided with a broad array of support including job hunting, assistance, various counseling programs and severance payments.

20 February Bulletin.

Ponzoni contends, according to the general language of the 20 February 1990 Bulletin, involuntarily terminated employees were entitled to receive enhanced severance pay without signing the Release.[19] Ponzoni Aff., ¶ 12. Even assuming Ponzoni's termination was not treated as a voluntary termination,[20] the 20 February 1990 Bulletin does not state *all* involuntarily ter-

---

**18.** Kraft affidavits and supporting exhibits do not describe the extent of non-enhanced severance pay employees were entitled to, if any. Ponzoni in a sworn statement to the EEOC stated that it was either two weeks severance or twenty-four weeks severance if he signed the Release. App.Vol. III, D–44, ¶ 20.

**19.** At his deposition, Ponzoni testified:

Q. Why should their money stay on the table?
A. I assumed it would … whether you were separated voluntary, involuntary, they said you were going to get severance pay anyway.

1st Ponzoni Dep. 127:25–128:6. Ponzoni based his belief on the general statement in the 20 February Bulletin.

**20.** As previously mentioned, it is unclear whether Ponzoni's termination was handled as a voluntary or involuntary termination. Throughout his deposition, Ponzoni claims he does not know why his termination documents were backdated to 9 March 1990. 1st Ponzoni Dep. 84:8–15. Zanetich explained, however, on 12 March 1990 Ponzoni agreed that it would be easier for him to be treated as a voluntarily terminated employee. Zanetich Dep. 19. Therefore, Zanetich states he instructed Ponzoni to backdate his termination documents. *Id.*

minated employees will receive *enhanced* severance pay.

The 20 February 1990 Bulletin makes a general statement to the employees regarding the events surrounding the Kraft reorganization. Although it did state "[a]nyone whose employment is terminated will be provided with ... severance pay," it did not go into the nature of severance pay to be received by voluntary or involuntarily terminated employees. Accordingly, the 20 February 1990 Bulletin cannot be interpreted to promise enhanced severance pay to all involuntarily terminated employees. Therefore, Ponzoni cannot use the 20 February Bulletin as a basis for his claim that he was, as an involuntarily terminated employee, otherwise entitled to the $135,000.

Ponzoni's testimony also contradicts his asserted understanding. Ponzoni made the following statements with respect to receiving enhanced severance pay at Kraft:

Q. ... as far as you knew or heard, everyone who got [enhanced] severance pay had to sign a release to get it?
A. Well, like I alluded to before, I assume so, yeah.

1st Ponzoni Dep. 68:15–20. No where in his testimony did Ponzoni testify that he was aware of a Kraft policy to allow an employee to get enhanced severance pay without signing a release.

Ponzoni's testimony further cuts against his allegation that he was unaware he had to sign the Release to receive enhanced severance pay. When testifying about his meeting with Zanetich, he stated Zanetich said something to the effect that Ponzoni had to sign the Release in order to get his money.

In *Pears*, plaintiff claimed ignorance by quibbling over the terms of the release while admitting she understood the impact of the Release. *See Pears*, 718 F.Supp. at 446–47. The plaintiff knew that by signing the release she could not sue the company;

however, she claimed she did not know what the words "release" and "discharge" meant. *Id.* at 447. The court held "plaintiff's quibbling about simple everyday language rings quite hollow and will not avoid summary judgment." *Id.*

In this case, in light of Ponzoni's testimony and Kraft's clear policy regarding the release requirement, Ponzoni's view of the applicability of the language of the documents he possessed cannot be the basis to defeat summary judgment.

Ponzoni also argues the consideration did not exceed what he was already entitled to as a result of his many years of service and the years he had left in service even if his termination was voluntary. Ponzoni Aff., ¶ 13; 2nd Ponzoni Dep. 156:3–18.[21] In *Cirillo*, the plaintiff argued that he believed the terms of the release only pertained to claims arising from the retirement options under the various retirement plans, not to claims arising from his termination. *See* 862 F.2d at 452. The court stated:

Even if we accept that Cirillo in fact understood the Release as not addressing any claims arising from his firing, we must conclude that such a misguided subjective belief, without more, is insufficient to defeat summary judgment in the face of clear and unambiguous language. A contrary conclusion would undermine the utility of the voluntary settlement process.

*Id.* (citations omitted).

Ponzoni's belief that he was entitled to enhanced severance because of his many years of service despite the terms of the Release is baseless. The terms of the Release explicitly stated that the waiver of claims against Kraft was in consideration for receiving enhanced severance pay. Release, ¶ 1. Ponzoni's subjective belief does not form a basis to hold that the consideration given for his release of claims did not

---

**21.** In his deposition, Ponzoni testified:
Q. Why do you feel you were entitled to the severance payments?
A. ... 35 years, three months, 18 days—you know, just like that, go to the gate—no nothing—you know. All of my patents, the company has made millions of dollars—although

than's what they pad me to do and I thought I was doing it.
Q. That's despite the expressed terms of the release—
A. Despite the terms of the release.
2nd Ponzoni Dep. 156:3–18.

exceed the benefits to which he was legally entitled.

With respect to the years of service Ponzoni had left, his belief is without merit. Ponzoni was terminated. He had no contractual right to be employed until he was sixty-five. He was not entitled to $135,000 in enhanced severance to cover his expected losses.

Ponzoni has failed to raise a genuine issue of material of fact with respect to the validity of the Release; all the factors weigh in favor of finding that Ponzoni executed a knowing and voluntary waiver. Accordingly, summary judgment is granted in favor of Kraft regarding the validity of the Release and Ponzoni's ADEA claims.

### 2. *Waiver of NJLAD Claims*

Kraft argues Ponzoni waived his right to raise state age discrimination claims by signing the Release. In *Swarts v. Sherwin–Williams Co.*, 244 N.J.Super. 170, 581 A.2d 1328 (App.Div.1990), the Appellate Division adopted the totality of circumstances standard of review followed by the Third and Second Circuit Courts. *Id.* at 177, 581 A.2d 1328. In adopting the totality of circumstances analysis, the Appellate Division stressed the "need to carefully examine any situation in which an older worker bargains away his statutory right to be free from age discrimination." *Id.* at 177, 581 A.2d 1328.

■ For the reasons set forth above, Ponzoni made a knowing and voluntary waiver of his NJLAD claims. Ponzoni was fully aware of his statutory rights and had ample time to deliberate or discuss with an attorney the rights he was waiving. Ponzoni did not sign the Release in order to get retirement benefits, but rather to take advantage of an enhanced severance pay package.

Ponzoni has failed to establish a genuine issue of material fact with respect to the validity of the Release under NJLAD. Accordingly, summary judgment is granted in favor of Kraft regarding the validity of the Release and Ponzoni's NJLAD claims.

### C. Rescission of the Release

Ponzoni argues regardless of whether he made a knowing and voluntary execution of the Release, his retrieval of the Release on 12 March 1990 constituted a rescission. Ponzoni further contends he did not later accept the terms of the Release because he was unaware the Release was resubmitted to Kraft. It is undisputed Ponzoni retrieved the Release from Kraft's personnel office. The dispute concerns *how* the Release was returned to Kraft.

■ Under ordinary contract principles, a party's acceptance must be clear and unequivocal. *Mellon Bank, N.A. v. Aetna Business Credit Inc.*, 619 F.2d 1001, 1015 (3rd Cir.1980); *Kalish & Rice, Inc. v. Regent Air Corp.*, 624 F.Supp 173, 176 (S.D.N.Y.1985); *In re Athos Steel and Aluminum, Inc.*, 71 B.R. 525, 543 (Bankr. E.D.Pa.1987). Acceptance can be done through acts or conduct. *Havens Steel Co. v. Randolph Engineering Co.*, 613 F.Supp. 514, 522 (W.D.Mo.1985); Restatement (Second) of Contracts, § 19 (1981). When acceptance is by conduct, the court must look to objective circumstances, not the subjective intent of the party. *Capital Assoc. Int'l, Inc. v. Knoll Int'l., Inc.*, No. 90–5518, 1991 WL 158959, 1991 U.S. Dist. LEXIS 11285 (E.D.Pa. 14 August 1991); *see also NLRB v. International Union of Operating Eng'rs*, 315 F.2d 695, 699 (3rd Cir.1963) (" '[C]onduct which imports acceptance is acceptance . . . whatever may have been the actual state of mind of the party.' " (Holmes, J.)); Restatement (Second) of Contracts, § 19.

■ Looking at the entirety of the record, Ponzoni made an unequivocal acceptance of the Release. Ponzoni's affidavit states that at the time he changed his address, he "was not sure whether [he] was going to return the release or whether [he] was going to keep it." Ponzoni Aff., ¶ 9. Ponzoni testified after changing the address he put the Release back into his personal WRP file. 2nd Ponzoni Dep. 125:9–14. Ponzoni also admits he received a memorandum from personnel that stated: "We do not have your white forms that were in the package that you received. We

have to have them if you want your money." App.Vol. III, D–43; 3rd Ponzoni Dep. 6:3–7:18. Ponzoni was aware from reading the Release that enhanced severance pay was conditioned on signing the Release. 1st Ponzoni Dep. 124:9–18.

Ponzoni testified that on or around 28 March 1990, he received a call from Hips requesting the white forms. *Id.* 125:15–30. At that time, Ponzoni took his personal WRP file to Hips' office. Rather than asking Hips what forms she needed, Ponzoni told her to "take what you need." *Id.* 125:17–126:7. In his affidavit, Ponzoni claims he did not know the Release was in his folder. Ponzoni Aff. ¶ 10. Ponzoni does not recall watching Hips take forms or discussing with her which forms she was taking. 2d Ponzoni Dep. 126:2–7.

Ponzoni's conduct constitutes a valid acceptance. Ponzoni has only offered his subjective state of mind that he did not intend to return the Release and that he did not know the Release was in his personal WRP file. Ponzoni's conduct does not, however, convey the same intent. After having been told that he had to submit forms in order to receive his money, Ponzoni took no affirmative steps to guarantee the Release was not redelivered to Kraft. Rather, Ponzoni took his WRP file to Hips' office and told her to take what she needed. At no point, did Ponzoni manifest to Kraft, verbally or through conduct, any intent other than that he intended to return the Release to Kraft.

Considering the objective circumstances, Kraft could not know Ponzoni did not intend to accept the Release when he submitted his file to Kraft. Accordingly, Ponzoni's acceptance was unequivocal.

### D. Ratification of the Release

■ Kraft argues even if Ponzoni's allegations concerning the *Cirillo* factors or the resubmission of the Release are accepted, it is still entitled to summary judgment. Kraft argues when Ponzoni accepted the $135,000, he ratified the terms of the Release.

In *Mullen,* plaintiff executed a severance agreement and addendum under which plaintiff released any claims against defendant for which plaintiff received a sum of money. 733 F.Supp. at 1548. After receiving payment under the severance addendum, plaintiff raised breach of contract claims against the defendant. It was held:

> Even if the release had not been effective when signed, [plaintiff's] acceptance of the benefits of the Severance Agreement and failure to complain until all checks had been delivered would ratify the contract.

*Id.* at 1548 (citing *Client's Sec. Fund v. Allstate Ins. Co.,* 219 N.J.Super. 325, 333–334 (App.Div.1987); *Clarkson v. Selected Risks Insurance Co.,* 170 N.J.Super. 373, 379–380 (Law.Div.1979); *American Photocopy Equipment Co. v. Ampto., Inc.,* 82 N.J.Super. 531, 538–39, 198 A.2d 469 (App. Div.) *cert. denied,* 42 N.J. 291, 200 A.2d 125 (1964), *cert. denied,* 379 U.S. 842, 85 S.Ct. 80, 13 L.Ed.2d 47 (1964).

The acceptance of benefits ratifies the release of ADEA claims. *See O'Shea v. Commercial Credit Corp.,* 930 F.2d 358, 362–63 (4th Cir.1991); *Grillet v. Sears, Roebuck & Co.,* 927 F.2d 217 (5th Cir.1991); *Constant v. Continental Telephone Co.,* 745 F.Supp. 1374 (C.D.Ill.1990); *Dalessandro v. Monk,* 864 F.2d 6, 8 (2d Cir.1988); *E.E.O.C. v. American Express Public Corp.,* 681 F.Supp. 216, 219 (S.D.N.Y.1988) (acceptance of benefits constitutes ratification); *Widener v. Arco Oil and Gas Co.,* 717 F.Supp. 1211, 1217 (N.D.Tex.1989).

In *Widener,* the plaintiffs argued they were unaware that they had signed a release until the defense was raised by the defendant in the litigation. The court held even if the releases were not knowingly and voluntarily executed, the plaintiffs ratified them by retaining the monies paid as consideration. *Widener,* 717 F.Supp. at 1217.

In *Grillet,* the court stated:

> A party cannot be permitted to retain the benefits received under a contract and at the same time escape the obligations imposed by the contract. . . . If a releasor, therefore, retains the consideration after learning that the release is voidable, her

continued retention of the benefits constitutes a ratification of the release.

927 F.2d at 220 (citations omitted).

As previously stated, Kraft had no standard enhanced severance program. Upon Ponzoni's termination, he was not entitled to enhanced severance pay. He could receive enhanced severance pay only if he signed the Release. Ponzoni testified that Zanetich told him he must sign the documents presented to him in order to receive the enhanced severance pay. The record also indicates after Ponzoni signed the Release, he took it back to his office to read it. He testified that he understood the "in consideration" language to mean he had to sign in order to get his money.

Regardless of whether Ponzoni knew Kraft possessed the Release when Ponzoni received the check for $135,000, he was well aware of Kraft's bargain. Because Ponzoni retained the $135,000 with knowledge of the bargain and no other valid claim to the consideration, he thereby ratified the Release.

*Conclusion*

For the foregoing reasons, partial summary judgment is granted and the complaint is dismissed in its entirety with prejudice under Fed.R.Civ.P. 56.